McMahon, *et al. v.* McClernan.

Decided May 1st, 1877.

10   419
63   706

10   419
65   503

1877.
January Term.

1. It is a violation of good faith for any partner to stipulate clandestinely with third persons, for any private and selfish advantage and benefit to himself exclusive of the partnership; for all the partnership property and partnership contracts should be managed for the equal benefit of all partners, according to their respective interests and shares therein. If therefore, any one partner should so stipulate clandestinely for any private advantage or benefit of himself to the disadvantage, or in fraud of his partners, he will in equity be compelled to divide such gains with them.

2. In all purchases and sales made on account of the partnership, every partner is bound to act expressly for the benefit of the partnership.

3. It seems to be an established principle in the law of partnership ordinarily, that if it be without any definite period, any partner may withdraw at a moment's notice, when he pleases and dissolve the partnership,

4. But to enable a partner or two partners where there are three, to dissolve such partnership at his or their will, the renunciation must be made in good faith, and the renunciation is not made in good faith when it is made in order to appropriate to himself or themselves, the profits which the firm is entitled to receive.

5. A partnership for a limited period cannot be dissolved at the mere pleasure of one of the partners, but may be dissolved for reasonable cause.

6. When a dissolution of a partnership has taken place an account will not only be decreed, but if necessary, a manager, or receiver will be appointed to close the partnership business, and make sale of the partnership property, that a final distribution may be made of the partnership effects.

7. The appointment of a receiver when directed, is made for the benefit, and on behalf of all parties in interest.

8. A case in which the court when there was a partnership unlimited as to time, appointed a receiver at the instance of two of the partners to manage and control the business of the firm, and the receiver being one of the partners and a plaintiff did proceed to carry on the business of the firm with its property and effects under the direction of the court, and while the business of the firm was so managed and carried on under the direction of the court with the property and effects of the firm, large profits were realized from the business, and reported to the court, and the court permitted all the partners to participate equally in such profits, notwithstanding the plaintiffs claimed they had dissolved the partnership by their act and against the consent of their partner before they commenced the proceeding in which the receiver was appointed. See opinion of the Court.

Appeal from, and *supersedeas* to, a decree of the circuit court of Greenbrier county, rendered on the 30th day of June, 1875, in a cause in chancery in said court then pending, wherein Edward McMahon and John R. Wills were plaintiffs, and James McClernan was defendant, granted upon the petition of the said plaintiffs.

The facts sufficiently appear in the opinion of the Court.

Hon. Homer A. Holt, Judge of the eighth judicial circuit, presided at the hearing below.

*Mathews & Mathews,* for appellants, referred to the following authorities :

*Whitesides v. Lafferty,* 3 Humph., 150; *Hyde v. Easter,* 4 Md., 80; *Dunbar v. Barber,* 14 Ohio, 311; *Taylor v. Hutchison,* 25 Gratt., 536; Kerr on Receivers, 159, 163; 7 Gill 307; High on Receivers, p. 89, §134 n. 1; *Beverly v. Brooke et al.,* 4 Gratt., 212; High on Receivers, 90, §135, 357, 540; *Sharp v. Carter,* 3 P. W., 375; 1 Harr. (Del.), 904.

*Samuel Price,* for appellee, referred to Story on Part.,

§231; Gow on Part., 114; *Seeley v. Boehn*, 2 Madd., 176; Story on Part., §380; 3 Kent Com., 34–5–6–7; Story on Part., §348 (a) and n. 4; *Richardson v. Bank of England*, 4 Myl. and Cr., 165, 172; *Tyree et al. v. Donally*, 9 Gratt. 64.

1877.
January Term

McMahon et al.
v.
McClernan.

HAYMOND, JUDGE, delivered the opinion of the Court:

On the 22d day of Feburary, 1871, the plaintiffs filed their bill in the circuit court of the county of Greenbrier, against the defendant. The plaintiffs in their bill allege substantially that on the 13th day of May, 1870, they entered into an article of agreement with the defendant for the formation of a partnership which was known and did business under the firm name of Mc-Mahan & Co., for the purpose of putting Greenbrier river, or a part thereof, in navigable order for batteaux, extending also down New River so far as the said partners might think proper, and to build and place upon the said river a sufficient number of boats to carry all such freights as might be offered for transportation; that by the said agreement the parties thereto should build a suitable store house, stable and whatever other buildings might be necessary for their work at Greenbrier river, and that the said parties should jointly furnish two or more teams sufficient to transport such freight as might be offered from White Sulphur Springs to the said boats at Greenbrier river bridge. And each of the said parties agreed and bound himself to pay one-third of the money required to complete the work, and to share equally in the profits and losses of the business. All of which will more fully appear from a copy of the said agreement herewith filed and prayed to be taken as part of this bill marked Exhibit A; that in pursuance of the terms of the said agreement, and in the partnership character thereby created, the said firm went on to build a store house and stables, to clean out and improve the river, to build boats, purchase wagons and teams, etc., for the purposes of their business, and that in all

this work, purchases and improvements, they expended a large sum of money, to-wit, the sum of $———, and the plaintiffs allege and charge that the said James McClernan never contributed anything whatever to the payment of the said expenses, and never in any way, shape or form put any capital into the said business, as by the said agreement he bound himself to do, but that, in fact, all the said money and capital was furnished by the said Edward McMahon ; that the said defendant, James McClernan, was the chief business and managing man of the said firm, and as such, had chief management and, control of all its business, and charge and control of its property, received all moneys and disbursed the same, and while the plaintiffs do not know and cannot state the full extent of the transactions of the said firm, they do know and aver that it has done a large and profitable business, and that there has never been a complete and perfect settlement of its business and accounts so as to ascertain the amount of its profits or its losses, so as to distribute the one or sustain the other ratably ; that having become dissatisfied with the way in which the business of the said concern was managed and carried on, and being anxious to terminate it and wind it up, they determined to dissolve the said partnership, and, on the 20th inst., proceeded to do so ; that the said McClernan was unwilling, and refused to give his consent to the said dissolution, and refused to surrender the property and business, and to enter into a settlement thereof, but still continues to retain and hold possession and management, although, as stated, he has never paid a dollar into the concern ; that the plaintiffs believe and charge that the said defendant is wholly and entirely insolvent, and should he dispose of or convert the property belonging to the said partnership, they could have no recourse upon him, but would be greatly and irremediably damaged. They pray that said McClernan be made a party to the bill, and required to answer it fully under oath ; that a dissolution of the said partnership, if it be not already an accom-

plished fact, may be decreed by the court; that an injunction be granted to prohibit and restrain the said defendant from carrying on further or longer the said partnership business, and that your honor appoint a receiver to take exclusive charge, possession, management and control of the business of the said firm, and of its books, papers of every kind and description, and all its other property of every kind, real and personal, houses, boats, wagons, horses, stables, implements, &c.; and that your honor will order and direct the said defendant to give up and surrender all such property and effects of every kind to the said receiver to be appointed; that a decree be rendered by the court, requiring one of its commissioners to take, state and report in full an account of all the transactions and business of the said concern, ascertaining the interest and liability of each of said partners in and to the assets; that they may have such further full and complete relief as comports with equity and good conscience, &c. This bill seems to have been verified by the affidavit of said McMahon. The agreement of partnership, mentioned in the bill as Exhibit A is as follows :

"This agreement, made this 13th day of May, 1870, between Edward McMahon, John R. Wills and James McClernan, known and trading under the firm name of the Greenbrier Boat Company.

"It is agreed by all the parties above named to put the Greenbrier river in navigable order for batteaux boats from Greenbrier river, on the James river and Kanawha turnpike road to Graham's Ferry, or such other points extending down New river as they may think proper, and build and to place upon the above named river a sufficient number of boats to carry all and such freights that may be offered for transportation upon the river.

"It is also agreed by the parties to this contract to build a suitable storehouse, stables and whatever buildings necessary for the works at Greenbrier river.

" It is still further agreed, and we bind ourselves jointly, to furnish two or more teams sufficient to transport such freights as may be offered from White Sulphur Springs to the boats at Greenbrier river bridge.

In compliance with the above, we agree and bind ourselves to furnish each one-third of the money required to complete the work, and it is also agreed that each and every party named in this agreement shall be equally interested in the profits and losses of the business.

[Signed]                              " EDWARD McMAHON,

                                      " JOHN R. WILLS,

                                      " JAMES McCLERNAN."

Either at the time of filing the bill, or very soon thereafter, the plaintiffs procured the Judge of the circuit court to make an order, in these words, viz: " Upon motion of the plaintiffs, and for reasons appearing, it is ordered that E. McMahon be and he is hereby appointed special receiver in this case, with directions to take exclusive charge, possession, management and control of the business of the firm of McMahon & Co., and of its books, notes, accounts, papers of every kind and description, and all of its property of every kind, real and personal, houses, boats, wagons, horses, stables, implements, &c. And it is further ordered that the said defendant, James McClernan, shall surrender all the property, and effects of every kind, to the said McMahon, receiver as aforesaid. But the said McMahon, before proceeding to act under this order, or to receive any property, shall give bond in the penalty of $15,000, conditioned for the faithful discharge of his duties as such receiver, with security, to be approved by the clerk of this court."

It does not appear by the record that the defendant had any notice of the application for the appointment of a receiver. On the 7th day of March, the plaintiff procured the same Judge to make an order in said cause as follows:

" On motion of the plaintiff, E. McMahon, by his coun-

sel, it is ordered that this cause be referred to Mark L. Spotts, as special commissioner, who, after giving ten days' notice to the parties to this suit, shall take, state and report an account of the partnership business and transactions of the late firm of McMahon & Co., showing the amount of capital paid in and invested by each of the partners, the profits arising or the losses incurred by the said business, the value of the assets of the said firm of any kind, and the interests of the said partners therein respectively—opening the said account as of the date of the formation of the said partnership, and closing it as of the 22d of February, 1871, when the said business was placed in the hands of a receiver.

"And it is further ordered that the said commissioner state and report an account of the transactions of the said E. McMahon, as special receiver, heretofore appointed in this cause, in conducting the business of the said firm of McMahon & Co.; and any other matter deemed pertinent by himself or required by either party shall be specially stated. The said commissioner shall make report of his proceedings under this order to the next term of the circcuit court of said county.

(Enter.)                    J. M. McWHORTER."

The record does not disclose that the defendant had any notice of the application of the plaintiffs for the making of the last named order. The defendant, McClernan, after the above named orders were made in vacation, and as I infer after the 20th day of March, 1871, (as his affidavit verifying said answer is of that date) filed his answer to the plaintiff's bill as follows:

"*To the Hon. J. M. McWhorter, Judge of said court:*

"This respondent, reserving the benefit of all proper exceptions to the complainants' bill, demurs to the same, and prays that this, his demurrer, may avail him at the hearing as if the same were more fully pleaded. And for answer this respondent says that it is true that the complainants and himself entered into a partnership for the purposes set forth in the bill, and he and said McMahon

were also partners as agents in the Hazard Powder Company. The complainants have not mentioned this interest in their bill, although they have caused the same to be turned over to the receiver appointed by the court.

"The contract for the Hazard Powder Company was entered into by respondent and Edward McMahon before the complainant, Wills, had any interest in the firm, and was made at that time with a view to the improvement to be made on the Greenbrier river; it then had not been contemplated to take John R. Wills as a partner, but only to secure his services on the improvement to be done on the river. A copy of said contract is here filed marked A.

"The said improvement was first proposed to this respondent early in the spring of 1870, by the complainant, Edward McMahon, who stated that the river would have to be improved, and that the Chesapeake and Ohio railroad company were interested, and he was of the opinion that the company aforesaid would furnish the money. Upon the condition that the railroad company would furnish the necessary funds, and if it would not, then that each partner should furnish his share, your respondent agreed to unite with the complainant, McMahon, in the said improvement; and afterwards, at the request of the said McMahon, John R. Wills was permitted to come in as one of the firm, although it was known at the time that he had no capital to employ. It was the understanding that your respondent should be the active member of the firm, aided by complainant John R. Wills, and the complainant, McMahon, if he failed in getting the funds from the railroad company, was to furnish the funds for himself and said Wills, and respondent to furnish his part. If the funds from the railroad company were furnished, the partners were not expected to have to furnish any, and none have been called for of this respondent. It is true that the agreement or contract of partnership states that each one was to furnish one-third of the money required to complete

the work; this agreement is dated May 13th, 1870; and in his letter of May 30th, 1870, (that is the letter of Edward McMahon, which is herewith filed as a part of this bill, marked B, copied, page 16, as is also his letters of the 18th and 20th of May, marked C and D, copied, page —) he says: 'I can get a loan of as much funds as I want, so you will notify John Wills to secure as many good boats as he can get, and to have some more built at the Cowpasture Bridge, or, in other words, you and *him* go ahead as rapidly as you can, and *I will see that you have as much* funds as is necessary.'

"The meaning and intention of the said agreement was, that each member should be responsible for the return of one-third of the money obtained for the work. On the 12th day of July, 1870, the complainant, McMahon, entered into a contract with the Chesapeake & Ohio railroad company, whereby he obtained from said company for the benefit of McMahon & Co., $10,000, without interest, for one year. A copy of said contract is herewith filed marked Exhibit E, as a part of this answer. This contract, although made in the name of one of the partners, was made for the benefit of the firm, and the advantages or profits must be divided between each member of the firm, and all that can be required of this respondent is, that if the business and profits of the firm are not sufficient to pay to the railroad company in freights or otherwise as per the contract, by the 12th day of July next, is to advance his portion of the deficiency. At the time of the suing out of the writ enjoining your respondent, the firm of McMahon & Co. had charged to the Chesapeake and Ohio railroad company for transportation of freight about $8,500, and long before the 12th day of July, 1871, the whole amount loaned by the Chesapeake and Ohio railroad company to the firm of McMahon & Co. will have been paid. This respondent avers that he is in as good condition pecuniarily as he was when he first entered the firm of McMahon & Co., and that at the last sitting of the legislature of the

State of West Virginia, it granted your respondent, Edward McMahon and John R. Wills, and their associates, a charter guaranteeing them the exclusive right to improve and navigate Greenbrier river and New river, and he is of the opinion that his interest in this franchise is enough to indemnify his co-partners against any loss they may sustain. The complainants aver that no settlement of the partnership business has ever been made, and, therefore, they cannot tell whether the business has been conducted properly or not. This may be true, but it is not the fault of this respondent; he has always been ready to settle, and the books have always been open to the inspection of each member of the firm, and if they were as fearful of this respondent as they now *pretend* to be, they would have known something about the business, and respondent has as much right to complain at their neglect in not attending to the business; and certainly they have no right to complain at their ignorance, when it was their own fault. Complainants do not charge that he has been guilty of any breach of trust, or that there is any endeavor of such intention on his part.

"Respondent avers that he has been faithful in the discharge of his duties, and has at all times had in view the interest of McMahon & Co.; that for many months he labored to get the river in such a condition that they could realize some compensation for their services, and that he has now got the same in good working condition, and the company is deriving large profits from his services so rendered, and this consideration has, no doubt, induced the action on the part of the plaintiffs, and soon the business will be largely increased by the letting out of the contracts for the completion of the whole line of the Chesapeake and Ohio railroad.

"Respondent avers that the firm of McMahon & Co. was formed for the purpose of carrying freight on the river during the building of said road, and that said partnership cannot be dissolved without good cause until

the object for which the firm was organized has been accomplished ; that he has been faithful in all things as a partner, rendering all the service required of him, and misapplying no funds and endangering none. The improvement of the Greenbrier river has been a valuable investment, and this respondent avers that there is no reason for the proceedings had by the complainants, except that the profits divided between two will be greater than to divide the same into three parts, and submit whether that is sufficient to give to the complainants what they pray for in their bill ; having fully answered, he prays hence to be dismissed with his proper costs and charges."

The Hazard Powder Company contract referred to in the defendant's answer, is as follows :

" By this agreement, the Hazard Powder Company, of Hazardville, Connecticut, agree to erect a powder magazine at Greenbrier bridge, Western Virginia, and keep it supplied to the best of their ability with blasting powder and safety fuse, paying all expenses and taking all risks of explosion on same while in transit from New York to Greenbrier bridge, W. Va, and while in magazine there, provided proper care be taken of the same. All other expenses to be borne by Messrs. McMahon & Co., except carting from White Sulphur Springs railroad depot to the magazine at Greenbrier Bridge, for which they are to receive (10c) ten cents per keg on the powder, and (50c) fifty cents per barrel on the fuse. Messrs. McMahon & Co. hereby agree to act as agents for the Hazard Powder Company, and take charge of such powder and fuse as may be consigned to them by the said company, and make sales of same to such contractors on the extension of the Chesapeake and Ohio railroad as they may in their good judgment deem perfectly safe and solvent—Messrs. McMahon & Co. to make collection for same, and render a monthly account of sales and returns, for all sold during the month, to the Hazard Powder Company at their office, No. 80 Wall street, New

1877.
January Term.

McMahon et al.
v.
McClernan.

York, who agree to allow Messrs. McMahon & Co. for said services (10) ten cents per keg commission on the powder, and (5) five per cent commission on the *selling* price on *fuse.* Prices to be governed by the said Hazard Company. The magazine to be used for no other purpose than the storage of powder and fuse, the property of the said Hazard Powder Company. Executed at White Sulphur Springs, West Virginia, this 9th day of April, 1870.

> "THE HAZARD POWDER COMPANY,
> "*Per Wm. S. Colvin,*
> " EDWARD MCMAHON,
> " JAS. MCCLERNAN."

Exhibit E, filed with defendant McClernan's answer, is as follows:

" Memorandum of an agreement, made the 12th day of July, 1870, between Major Edward McMahon, of Staunton, Virginia, of the first part, and the Chesapeake and Ohio railroad company, of the second part: The said Edward McMahon, on his part, agrees:

" 1st. To improve by sluice navigation, the Greenbrier river from the point at which the road from White Sulphur Springs to Lewisburg crosses it to the point nearest the east end of Great Bend tunnel, and if practicable to the point nearest the west end of said tunnel.

" 2d. To improve the navigation of Greenbrier and New river from the point last mentioned to Richmond Falls, if practicable, and if the said railroad company, party of the second part, shall require it.

" 3d. To haul all the material the said Chesapeake and Ohio railroad shall desire to have hauled from White Sulphur Springs to the first crossing of the railroad over Greenbrier river, and to points beyond on Greenbrier and New river as far as Richmond Falls, at and for the following rates of compensation for the hauling and delivering of every hundred pounds thereof, viz:

" 1st. To the said first crossing of Greenbrier river, sixty cents.

" 2d. To points between said first crossing and the points on the river nearest the west end of Great Bend tunnel, seventy-five cents.

" 3d. From said west end to Richmond Falls, and points between, an additional charge *per mile* equal to the mileage between Greenbrier bridge (turnpike), and the east end of Great Bend tunnel, at fifty cents for the whole distance.

" The Chesapeake and Ohio railroad company on its part agrees to advance to the said Edward McMahon, on the signing of this contract, the sum of $10,000, without interest for one year, to be repaid in freights under this contract, if sufficient within that time, and·any balance to be returned at the end of the year—said McMahon to deposit with the company collaterals satisfactory to cover such advance.

It is further agreed by and between the parties, that to secure the proper construction and due performance of this contract, all questions of difference that may arise between the company and the contractor in regard to its promptness of execution, promptness of transportation, and damage by detention or loss, shall be submitted to the arbitrament of the vice president and the chief engineer for the time being of the company, and their decision in all cases shall be final. The said company are to give said McMahon all their hauling from terminus of said road at or beyond White Sulphur Springs, going west of Greenbrier bridge.

" It is further agreed that the goods to be delivered to the company or contractors shall be delivered at such possible landings on the river bank as the company or contractors may designate. And it is further agreed that the rates of transportation for contractors for their supplies shall not exceed the charges herein named for the goods of the company to the west end of Great Bend tunnel and ratably from thence west. Witness the signatures of the said Edward McMahon and of Wm. C. Wickham, vice-president of the said Chesapeake and

Ohio Railroad Company, by authority and on behalf of said company."

This writing seems to have been executed by Wm. C. Wickham, vice-president of the Chesapeake and Ohio railroad only. McMahon does not appear to have signed it. No receipt for collaterals placed in the hands of said railroad company by McMahon appears on the record.

Special commissioner Mark L. Spotts made up his report on the 20th day of April, 1871, in which he says that in the examination of the matters of account connected with the late firm of McMahon & Co., "it does not appear that there was any actual capital paid into the concern by the partners. Edward McMahon made an arrangement with the Chesapeake and Ohio railroad company by which said company agreed to furnish him a loan of $10,000 (upon his depositing with the said company *certain collaterals* as security for the return of the same, without interest for one year, which sum was to be repaid to said company in freights, &c., at a price agreed upon, if sufficient; within that time, and any balance remaining unpaid to be returned at the end of the year. From the balance sheet taken from the ledger of McMahon & Co. it appears that there has been returned to the Chesapeake and Ohio railroad company, in freights, &c., the sum of $8,612.50, to be credited on the loan of $10,000. This loan was furnished from time to time by E. McMahon to the concern of Edward McMahon & Co. as the improvement of the river progressed, and it is a debatable question with your commissioner whether interest should be charged to and accounted for by the other partners of E. McMahon & Co. to E. McMahon. * * * The balance sheet marked F, represents the condition of McMahon & Co. as shown by their ledger, and from this statement it will be seen that the amount of credits will about meet all their liabilities, there being a small excess of credits over the debts, say $34.83, with the exception of the river improvement, the cost of which has been estimated at $4,000 or thereabouts; what

remains as assets of the said concern of McMahon & Co. is the inventory of goods, horses, wagons, &c., agreed upon and signed by the parties, and returned with this report, and amounts to the sum of $7,555.30. From which must be deducted this sum to-wit, $3,173.65; being a portion of some items embraced in this inventory, which had been charged on ledger to stock account. Amount over, $4,381.65. The balance sheet marked F, represents the amount due the Hazard Powder Company as $6,482.06.

A statement will be found, filed in this cause marked H, purporting to have been made out by the clerk of the firm of McMahon & Co., and nothing appears among the papers to show it has not been accepted by the Hazard Power Company as a fair exhibit of the state of accounts between the parties which represents the sum of $5,-496.15, as the true balance due to said Hazard Powder Company, and if that inference be correct, it will leave the sum to be added to the inventory, $985.91, making a total of $5,367.56.

Assuming that the statement is a true expose of the assets of McMahon & Co., and your commissioner has doubts, owing to the condition of the books, &c., in the distribution of the above sum of $5,367.56, James McClernan should be charged with the sum of $143.74 being the amount of his account on the ledger, and the further sum of $1,064.28, balance due to cash account (he being cashier) making $1,208.02, as the amount of the indebtness of James McClernan to the firm of Edward McMahon & Co., of which firm he was one of the partners and the cashier.

\* \* The said E. McMahon has not appeared before your commissioner with his accounts as receiver, and he has no material by which he can furnish and report or account in relation thereto." The said commissioner made a brief supplement to his report by which he reduces the said $5,367.56 balance of inventory to $5,-239.31. This reduction be arrived at by deducting

$128.25 being · cost, as he says, of building erected by and paid for by the Hazard Powder Company, and sample boxes belonging to same.

Several exceptions were filed to this report by the counsel of plaintiffs and one by the counsel of defendant, but it is unnecessary to notice them further under my view of this case. The act of the Legislature referred to in the answer of defendant, McClernan, is as follows:

An act to incorporate the Greenbrier Boating Company, passed February 25, 1871.

Be it enacted by the Legislature of West Virginia:

1st. Edward McMahon, James McClernan and John R. Wills, their associates and successors, are hereby constituted a body politic and coporate by the name and style of "The Greenbrier Boating Company," and as such they are empowered to improve and navigate the Greenbrier and New rivers from the crossing of the former by the James river and Kanawha turnpike to Bowyer's ferry, on the latter river. Said rivers are hereby declared to be public highways.

2. The stock of the said company shall consist of not less than one hundred nor more than five hundred shares of $100 each, and when one hundred shares are subscribed the said company may be organized by the election of three directors to manage the affairs of said company.

3d. The said corporators shall be credited in their subscription of stock with the amount which they have already expended in improving the navigation of the said rivers and in constructing boats.

4th. The said company shall have the right to purchase or lease any real estate that may be necessary for their purposes, and to make such charges for the transportation of freight as may be reasonable.

5th. The said company may demand and receive at such points in said river as may be selected by the directors of the company, such tolls as may be reasonable and approved by the Board of Public Works, not to ex-

ceed fifteen per cent per annum on the net cost of the improvement, including repairs.

I, W. T. Burdett, clerk of the House of Delegates, and as such, keeper of the rolls, hereby certify that the foregoing is a true copy, as appears from the records of my office, of an act passed February 25, 1871, and of chapter one hundred and seventeen of the Acts of 1871.

W. T. BURDETT,
*Clerk of the House of Delegates and Keeper of the Rolls.*

The letters B, C and D, filed by defendant with his answer as exhibits are as follows:

STRETCHER'S NECK TUNNEL,
*Monday Morning*, May 30, 1870.

"*James McClernan, Lewisburg. W. Va.*:

DEAR JAMES : Since I have seen you, I have learned, or have been informed, that I can get *alone* of as *much* funds as I want, so you will notify John Wills to secure as many good boats as he can get, and have some more built at the Cowpasture Bridge, or, in other words, you and him go ahead as rapidly as you can, and I will see that you have as much funds as is necessary.

" Your friend,
[Signed]  " EDWARD McMAHON."

"RICHMOND, VA., May 21, 1870.
"*Jas. McClernan, W. Va.*:

DEAR SIR:—On to-day Gen. Wickham received a letter from Mr. Huntington, the president, making further inquiry about solvency and other things, and I was called upon, and I believe I have satisfied the officers in Richmond. So Gen. Wickham will inform him by to-night's mail, and so soon as he receives an answer, he will write to me. In any event, Mr. Whitcombe promised to give me the boating of all the companies supplies, and from a rough estimate, it will amount to some thirty thousand dollars, so I have purchased all the supplies necessary for the boats, so you had better go ahead with your house; make it 55x35, and if necessary we

can put sheds around it to push ahead; the prospect is good. Inform Mr. Kincaid that I have purchased all the goods he asked for, and shipped them to him, they will be all at the White by Tuesday, 24th.

"Your friend,

[Signed]                    "EDWARD McMAHON."

"RICHMOND, May 18th, 12 P. M., 1870.

*Jas. McClernan, Esq., Lewisburg, W. Va.:*

My proposition to the company has been telegraphed by Wickham and Whitecomb to New York. The board is now in session there, I have not heard from it as yet, but I hope favorable from it. I think you should go ahead with your building. I am pleased to learn that you succeeded in Lewisburg as you have. I believe all will go well with us. I must close, as the mail is leaving.          "Your friend,

[Signed]                    " EDWARD McMAHON."

The following order appears to have been made by the board of supervisors of Greenbrier county, viz:

*"State of West Virginia:*

At a meeting of the Board of Supervisors of Greenbrier county, held at the court house thereof, on Monday, the 16th day of May, 1870, on motion of Edward McMahon, James McClernan and John R. Wills, composing the firm of McMahon & Co., it is ordained that they have the privilege of putting Greenbrier river in navigable order for batteaux boats from Greenbrier river bridge, on the James river and Kanawha turnpike road to Graham's Ferry, or such other points extending down the New river, as they may think proper, and to build and to place upon the above named river a sufficient number of boats to convey all such freights as may be offered for transportation upon the river. It is further ordained that the aforesaid parties have the exclusive right to navigate said river in the limits of Greenbrier county for the term of eight years from this date, free and unmolested."

Some depositions were taken and filed in the cause, the substance of which I will hereafter notice.

On the 28th day of April, 1871, the court rendered a decree in the cause as follows, viz:

" This cause came on this day to be heard upon the bill, answer, replication, exhibits, deposition, exceptions thereto, orders made in vacation, report of M. L. Spotts, special commissioner, appointed to take an account between the parties, exceptions thereto by both parties, motion of the defendant to dissolve the injunction heretofore allowed, and arguments of counsel. Upon consideration whereof, the court is of opinion that the parties, plaintiff and defendant, by the contract of the 13th of May, 1870, became equal partners in the business contemplated by said contract, and that each one of the parners bound himself to advance an equal amount of the capital of the firm, and that they were entitled to participate equally in the profits of the business, and that either party advancing more than one-third of the capital would be entitled, in a settlement with the others, to have the excess refunded to him with interest. The court is further of opinion that either party had for cause a right to dissolve the partnership, and the same was dissolved by the act of the plaintiffs, but until the business was closed, settled up, and the social property divided, the business would be conducted for the equal benefit of all partners; the court is, however, of opinion that the account taken and reported by commissioner Spotts is too imperfect to enable the court to close up the business by a sale of the effects of the company, which it would now do if a complete settlement could now be made; such a settlement, the court is of opinion, showing the condition of the partnership accounts between the partners, should be made before any sale can be made. It is, therefore, adjudged, ordered and decreed, that said report be recommitted to commissioner Alex. Walker, with directions to reform and perfect said account according to the principles hereinbefore announced,

and report any matter deemed materially by himself or required by any party, and upon the coming in of said report, the court will proceed to sell the property of the firm with all its franchises; until such report is made the receiver of the court heretofore appointed to take charge of the effects and business of the company, to-wit: Edward McMahon, be and he is hereby directed to continue the business of the company, and keep and return fair accounts of all receipts and disbursements on account of the business in his charge. The said commissioner Walker is also directed to settle and report the accounts of said receiver up to the time of taking said accounts." On the 27th day of May, 1873, on account of the death of Alex. Walker, on motion of the plaintiffs, the court appointed James Withrow in lieu of said Walker, with the same powers and like instructions. Afterwards on the 31st day of October, 1873, on motion of the defendant, and for reasons appearing to the court, the court set aside the order made at the May term referring the cause to said Withrow and referred the same to J. M. McWhorter, who was directed to take, state and report a settlement of the partnership account, and a settlement of the account of E. McMahon, special receiver appointed in this cause; said commissioner to have the same powers and instructions as are contained in the decree referring the cause to Alexander Walker, deceased. And at the same time, on motion of the defendant, McClernan, a rule was awarded against Edward McMahon, receiver in the cause, returnable on the first day of the next term, to show cause why he should not be fined and attached for contempt of court in failing to report to the court any account of the receipts and disbursements of the partnership in his charge. Special receiver McMahon made his report as such before the commissioner, and as the commissioner in his report states so much of it as is material to the questions arising in the cause for this court to determine, I will not now notice further the report of said receiver.

.On May 30, 1874, commissioner McWhorter made up his report to the court of the matters referred to him, which report is as follows : ·

*To the Hon. H. A. Holt, Judge of the Circuit Court of Greenbrier County :*

In pursuance of an order entered in said court, at the October term, 1873, in the cause of E. McMahon and J. R. Wills, plaintiffs, *v.* James McClernan, defendant, after receiving the report of E. McMahon, receiver appointed in this cause, your commissioner proceeded to the examination of the papers and evidence filed preparatory to making report, as required in the decree pronounced in the cause on the 28th day of April, 1871, settling the principles of the matters in controversy. By the terms of the contract between the partners of the firm (composed of Edward McMahon, J. R. Wills and James McClernan) each was to furnish one-third of the money to complete the improvement and carry on the business of the partnership, and each was to be equally interested in the profits or losses of the business. To get the capital upon which to prosecute the work, E. McMahon, one of the firm, entered into an agreement with the authorities of the Chesapeake and Ohio railroad company, whereby, by depositing certain collaterals with the railroad company as security, he obtained from said railroad company a loan of $10,000 for one year, without interest, to be repaid in freight under the contract between them, according to the agreed rates mentioned. Here two questions of controversy arise between the parties—

1st.   Whether the capital borrowed from the railroad company is to be regarded as borrowed by and for the use of the firm, or by and for E. McMahon individually, and by him advanced to the firm ; the plaintiffs claiming the latter to have been the case, and the defendant contending the former to have been the understanding. As Major McMahon entered into the contract individually for the loan, and filed his individual collaterals to secure

it, and the others partners assumed no responsibility in the matter, your commissioner can come to no other conclusion than it should be treated as a loan or advancement by McMahon to the firm, and has so treated it in this report and the accompanying statements.

2d. As to what was the true amount of capital in the operations of the firm, it does not appear to be definitely stated in any of the papers or depositions in the case, nor does it seem from any statement from the books of the firm that they show what sum constituted the capital, but it is certain that there was borrowed of the railroad company the sum of $10,000, which was advanced to the firm, and McMahon in his deposition says he contributed further of his individual means to something over $4,000, and from the bonds executed by the plaintiff, Wills, to McMahon, the capital was estimated at $14,000, as the bond for his third of the capital is just one-third of that amount. And again, by the deposition of McClernan, it is shown that the firm needed more funds than the $10,000 borrowed of the railroad company, as a second application was about to be made to the railroad company for an additional loan. So taking all the evidence and circumstances together, it seems probable that $14,000 was about the capital employed in the business, and the statement returned herewith by your commissioner is based upon that amount. It is not known at what time or times the capital was furnished, but as the larger portion was obtained from the railroad company by the contract of McMahon and the said company of the 12th of July, 1870, that is the date fixed upon by your commissioner from which to calculate interest on the capital, and it appearing that the business was closed in September, 1872, interest is calculated to the 12th of that month. In making this report and statement, McMahon is credited with all the capital, estimated at $14,000, employed by the firm, and as each one of the partners was to furnish an equal part of the capital, J. R. Wills and the defendant, McClernan, must pay interest on their

1877.
January Term.

McMahon *et al.*
v.
McClernan.

respective shares from July 12, 1870, to September 12, 1872. So the amount of interest on the two-thirds of the said capital is deducted from the reported net profits of the business, and McMahon credited therewith. Taking the account and report made by special commissioner Spotts to be correct as far as it went, made as of the date of injunction and dissolution of the firm, and the then assets of the firm, including as well debts due as the personal property on hand, to the amount of $5,239.31, (see agreed inventory of personal property, report and supplemental report, and statement of commissioner M. L. Spotts), and by the balance sheet of the firm's ledger of same date, the further sum of $24.83, aggregating $5,239.74. This amount stands as the net profits of the business at the date of dissolution of the partnership, and this sum passed into the hands of the receiver in the shape of personal property, debts, &c. Maj. McMahon's report as receiver, shows the transactions of the business since it passed into his hands as receiver, and by it it is seen that from the time he took charge of the business to its close, the gross receipts, including the sale of the personal property, were $45,049.54, and the disbursements for the same time were $31,163.78, making the net profits during the same time on all accounts amount to $13,885.76. But the defendant, McClernan, was chargeable, as of February 22, 1871, with $1,287.39, as shown by the receiver's report, and in this report and statement, said sum with its interest from February 22, 1871, to the close of the business, September 12, 1872, is charged to him, and the same is added to the profits of the business, which increases it to $15,293.51, which shows the true net profits of the firm from its inception to its close. Allowing to Maj. McMahon interest on $9,333.33⅓ from July 12, 1870, to September 12, 1872, which is the sum furnished by him to his partners, being two-thirds of the whole capital, and commission as receiver on the disbursements made by him, and there is left of

the profits to divide among the partners $13,447.91. In this report and statement, the capital is treated as before said as $14,000, and as all having been furnished by the plaintiff, E. McMahon, and as having been fully refunded at the close of the business; for in his report as receiver there is nothing shown to be due on the capital, and the profits are referred to as net profits of the business, which precludes the idea of anything being due on that account. By the accompanying statement is shown : 1st, the net profits of the business after deducting from the profits the interest due McMahon on $9,333.33⅓ furnished by him to his partners, and commission on the disbursements made by him as receiver, $632.27 ; 3d, an account of the firm with E. McMahon, giving him the interest and commission aforesaid, and his equal share of the net profits, and charging him with the amount he has received as exhibited by the balance sheet of the books of the firm, and what is still in his hands or under his control as receiver—by this statement McMahon is debtor to the firm the sum of $1,555.84 ; 3d, a like account with J. R. Wills, which brings him in debt to the firm $1,519.06 ; and 4th, a similar account with James McClernan, charging him with the amount he had received at the date of the injunction, and interest thereon from that date to the date fixed for the closing of the business, showing a balance due him from the firm of $3,074.88. It will be seen that the balances due respectively from the plaintiffs to the firm just aggregate the amount due the defendant. It seems proper to your commissioner that the defendant should be allowed interest on the amount found due him from the time that the business was closed, and has therefore, calculated the interest on the amounts due respectively from the plaintiffs from the 12th September, 1872, to the 1st June, 1874, and added to the amount found due, which shows there is due from the plaintiff, McMahon, at the last mentioned date $1,719.20, and from plaintiff, J. R. Wills, at the same date, $1,678.54. Next in the

statement, is shown the account of E. McMahon, as receiver, showing a balance in his hands or under his control of $1,522.47. The debts reported by him as doubtful, amounting to $606.11 still due him as receiver of the firm, is not taken into any of the calculations, and whatever may be collected of that amount should be divided equally between the partners. The plaintiff, McMahon, says he thinks he should not be charged with the full value of property as per inventory. In this account he is charged with it, but it is credited for the difference between the inventory and the sale of property, amounting to $1,418.37. Your commissioner thought at first of making alternate statements, showing: 1st, the amount due to or from each partner on the basis of the loan of $10,000 being made from the railroad company to the firm of McMahon & Co.; 2d, as made in this report; and 3d, fixing the capital at $10,000, and as advanced by McMahon to the firm—and made most of the calculations necessary, but after again examining the papers and depositions, the statement given seems to be the only one authorized by the evidence filed, and thinking that such alternate statements would rather confuse than elucidate the matter, has made but one statement, except at the instance of plaintiff. At the instance of plaintiffs' attorney, your commissioner has made a statement, closing the business and transactions of the firm at the date of the injunction, fixing the amount of capital at $14,000. At that date the firm had refunded by freights for the railroad company, $8,612.50 of the capital, which, according to the balance sheet returned with commissioner Spotts' report, was standing as a charge against the railroad company, and McMahon had due him $12,541.79, which your commissioner supposes must have included this advancement of $10,000, as the capital is not accounted for in any other way, and there was due McMahon on the capital $3,929.29 by allowing what was due from the railroad company to go to his benefit in payment of the loan. This would leave as

net profits in the business the value of the personal property on hand at the date of dissolution as per agreed inventory, and the sum of $985.91 as balance on sales for Powder Company (see Spotts' report). Deducting what was charged to stock account on the ledger, the item of $128.25 included therein, which it seems was the property of the Hazard Powder Company, and the above amount of $3,929.29 due McMahon, and there remains the sum of $1,302.02 to which must be added $34.83, the difference on the balance sheet in favor of the firm, making $1,344.85 as the net profit; then the interest on the two-thirds of the capital furnished ($14,000) by McMahon to the other two partners from the 12th of July, 1870, to the 22d February, 1871, is $342.22, and deducting this from the net profits, leaves to be divided among the partners the sum of $1,002.63, allowing to McMahon interest on two-thirds of the capital from July 12, 1870, to February 22, 1871, and one-third of the net profits at last date, and there is due him at said date the sum of $676.43. There is due at the same time to Wills the sum of $334.21, and there is due from the defendant, McClernan, $1,010.64. In making this statement, however, there seems to be a lack of $57.46 to meet the deficiency, and the amount is charged to McClernan as unaccounted for. In making the last statement there is nothing allowed to the defendant, McClernan, for his services, nor indeed, to any of the partners has anything been estimated on that account, but should the court change or unsettle the principle of the decree of April 28, 1871, it seems but justice to the defendant, that as he was deprived of the profits of a business which proved so lucrative to those who followed it up, that he should be liberally paid for the time he spent in the interest of the firm, if his services were worth anything. Having reported all that appears necessary under the decree of reference, or that is deemed material by your commissioner," &c.

The plaintiffs filed one exception to this report, viz;

" The first part of this report and the accompanying statement, No. 1, are excepted to by the plaintiffs, because the commissioner has proceeded upon mistaken principles, and his results and conclusions are necessarily wrong."

No other exception was filed to said report. I have omitted the tables accompanying the report, because the substance of them appears in the body of the report. The plaintiffs filed a petition for a rehearing in the cause, upon the ground that they are advised that the decree of the court rendered in the cause on the 28th day of April, 1871, is erroneous, so far as it adjudicates the question that the defendant, McClernan, is entitled to participate in the profits of the business conducted by the receiver, with assets, in which it was shown by commissioner Spotts' report that said McClernan had no interest whatever, and that said decree was inadvertently entered, or at least without due consideration.

On June 30, 1875, a final decree was rendered in the cause, by the court, as follows:

" This day came the plaintiffs, by their counsel, and filed their petition to the court for a rehearing of the cause, and the cause coming on to be heard this 30th day of June, 1875, upon the papers formerly read, report of Edward McMahon, special receiver of the court, report of James McWhorter, master commissioner, exceptions thereto by plaintiffs, with the depositions accompanying the same, the petition for a rehearing, filed as aforesaid, and argument of counsel. Upon consideration whereof, the court is of opinion that whether the petition is filed or not the prayer thereof ought to be overruled, the decree complained of being, in the opinion of the court, substantially correct. It is therefore adjudged, ordered and decreed, that the prayer of said petition be overruled, and that the petition be dismissed. And it is further adjudged, ordered and decreed, that the exceptions taken by the plaintiffs to the report of commissioner

McWhorter be also overruled as being too general, and the report confirmed, and that the defendant James McClernan recover against the plaintiff, Edward McMahon, the sum of $3,637, his share of the funds in the hands of said McMahon, receiver of the court, as appears as aforesaid in said commissioner McWhorter's report, with interest thereon from the 1st day of July, 1875, until paid. And it further appearing that other debts, to-wit: the debt due from R. L. Moore of $22.10, the debt due from Morris & Grattan of $151.28, the debt due from Meade & Baber of $27.69, and the debt due from Riley — McCabe of $405.04, or some part thereof, may yet be realized, of which, if realized, one-third will be coming to the defendant, subject to the costs of collection. It is, therefore, further adjudged, ordered and decreed, that the said receiver, McMahon, proceed to collect the same, pay one-third thereof to the defendant, and make report thereof to the court. It is further adjudged, ordered and decreed, that the said Edward McMahon pay all the taxable costs of both parties to this suit, and have credit upon this decree for one-third thereof."

The plaintiffs obtained an appeal from and *supersedeas* to the last named decree from one of the Judges of this court in vacation, and it now remains to be determined whether there is such error in said decree as that this court should reverse the same. The question presented in this cause for determination, is interesting, and is by no means devoid of difficulty. It is insisted by the appellants that the court erred in not setting aside or rehearing the said decree of the 28th day of April, 1871, and in confirming the report of commissioner McWhorter, and in decreeing in favor of said McClernan, and against said McMahon, the sum of $3,637.56, as and for his share of the funds in the hands of said McMahon, receiver of the court, as appears as aforesaid, in said commissioner McWhorter's report, with interest thereon from the 1st day of July, 1875, until paid, &c., and in not rendering a decree in favor of the plaintiffs against

said defendant, McClernan, for $1,010.64, the amount due from him when the partnership dissolved, with the accrued interest thereon. To the end that the decision of this court in this cause might not be misunderstood, I have made an extended statement of the pleadings and proceedings had in the circuit court. But I deem it proper, and in fact essential to state the substance of the depositions filed in the cause, and upon which the circuit court as well as the commissioner acted. The deposition of the plaintiff, John R. Wills, was taken, and he says in his deposition that the capital employed in the business of said firm was furnished by McMahon and himself; that he borrowed his portion of capital from McMahon, and there was an understanding between Mc-Mahon and himself, that McMahon would furnish his (Wills) portion of the capital, and that he (Wills) should pay him the interest thereon; that he gave said McMahon on the day before his deposition was taken, which was on the 30th of March, 1871, his bond for $4,666.66 for his part of the capital advanced for him by McMahon, and also another bond for the sum of $250, which was for the interest on said advancement up to that day from about the 20th of July, 1870; that said two bonds bear eight per cent interest. He also says that McClernan never advanced anything to the capital of the firm to his knowledge; that neither McClernan or him were parties to the contract with the Chesapeake and Ohio railroad company, marked Exhibit E; that McClernan's services commenced about the 1st of May, 1870, and they closed about the 21st of February, 1871; that McClernan directed the building of the houses, &c., at the river in the first place, and had charge of the business there generally, superintended the shipping, collecting freights, and paying out charges, &c. at the river; that he, witness, had charge of the boats on the river, and attended to the building of the boats; that in his absence it was attended to by McClernan; that he does not know that a dollar of profit was realized over expenses; that said

McMahon never gave the improvement of the river much attention; that the first freighting was done for a short distance, as far as Kelly's contract, about two miles, in the month of July, 1870, possibly, and in the month of August, same year, some cement was carried as low down as Manus' tunnel, and on the 27th of September, 1870, the sluicing of the river was completed as low down as the east end of Big Bend tunnel, and that they commenced sluicing the river on the 24th of June, 1870; that it was the understanding with the parties that Mc-Mahon's advice as to the management of the business and his influence with the contractors and Chesapcake and Ohio railroad company in obtaining *for the firm desirable contracts for the transportation of freight*, should be in lieu of his personal attention to the improvement of the river, and to the shipping, &c.; and he, (witness) considers that McMahon's influence was worth equally as much as either McClernan's or his services; that the Chesapeake and Ohio railroad company prior to the 20th of February had let the building of its road at seven points on the Greenbrier river; he thinks the said railroad company had advertised the whole line, (not before let) on the Greenbrier and New rivers, but cannot say whether it has been let or not, that he supposes when the whole line is let to contract, and the work commences, the business will increase, but is unable to say to what extent. McClernan in his deposition says, the sluicing of the river was first proposed to him about March or the 1st of April, 1870, by McMahon; that the sluicing of the river commenced about the 23d of June, 1870, and it was completed about the 27th of September, 1870, to the Big Bend tunnel; that he organized and managed the entire business of the firm with the exception of sluicing the river and running the boats; that the cost of sluicing the river, as near as he can say, was about $4,000, or upwards, and the receipts up to the commencement of this suit, were about $10,747.00; that he came into the possession of the original contract made

by McMahon with the Chesapeake and Ohio railroad company about the latter part of August, 1870; that it was given to him by said McMahon for the reason, as he supposed that he was the proper custodian of all papers belonging to the firm, and at the time he, (McMahon gave it to him, he (witness) expected to make out an account against the railroad company for freighting done up to the 1st of September, 1870, and he (McMahon) instructed him, (witness) that in order to have their account placed to their credit, it was necessary to have the approval of Major Peyton Randolph, division engineer of the railroad, and in order to get his approval to the account, it was necessary to exhibit the contract; that the $10,000 mentioned in the contract, obtained from said railroad company, was obtained for the benefit of McMahon & Co.; that he (witness) had numerous conversations with McMahon upon that subject, and the impressions left with him (witness) upon all occasions was, that the railroad company would advance $5,000, if not $10,000. The time we were boating was about three months, and we run about three boats; sometimes as many as four boats; at other times but one or two; that McMahon was to use his influence to obtain a loan from said railroad company, and his influence with contractors to purchase powder from them as the agents of the Hazard Powder Company, and also with the contractors to ship their freights with them (the said firm) and his influence with said railroad company, to give them the transportation of cement, &c.; that he (witness) obtained from the board of supervisors of Greenbrier county, the right to sluice and place the said river in navigable condition; that he thinks the business, when the line of railroad is put under contract, will require at least twelve boats to carry freight, &c., to the point of improvement on the said river, viz: the Big Bend tunnel; and if we run to Stretcher's Neck on New river as contemplated by the concern, it will require at least eight new boats; that the increase of the freights

of said railroad company, on the Greenbrier to its present terminus, under the contract made by Mc-Mahon, securing the entire freight of said company to said firm, after the contract for building the railroad shall be let on the whole line of the Greenbrier river, will be great, but to what extent can't say; that he is unable to state the real value of the improvement on the river, including the river buildings, and all property and privileges of said firm at the commencing of the suit, but judging from what has been done in three months' boating with but three boats, and what is expected to be done when the contractors all get to work along the line, he is satisfied, with judicious management, the profits will reach $20,000, at least, within the ensuing year; that the said firm was at other expense besides sluicing the river, for the purchase of horses, building houses, stables, &c., wagons, hire of hands, and building boats, but cannot state the amount; that it was not stated in any written agreement that McMahon should use his influence to get the loan from the railroad company, as an offset in part to the services of witness and Wills personally in the business, but it was the verbal understanding; that so far as the carrying for railroad company is concerned, there will be a falling off from what is expected, if the Big Tunnel is not arched, but that is uncertain. Lewis S. Creigh, in his deposition, says that he was in the employ of said firm from the 27th of September, 1870, until the 1st of January, 1871, as clerk and in charge of the business in the absence of McClernan; that while he was in the employ of said firm they run about three boats, and commenced about the 26th of October and run to the 21st of December, 1870. They stopped running because of the Christmas holidays and the freezing of the river; that he left in January, and knows nothing of the business since that time; that in conversation with McClernan and Wills, he understood that the capital was furnished by the Chesapeake and Ohio railroad company; that he so

1877.
January Term.

McMahon *et al.*
v.
McClernan.

understood from both of them; that after the accounts were made up, in December, McClernan told Captain Wills the amount of the current account, and Wills then said it ought to be sent in, so that they could have credit to them for the money furnished by the railroad company. Plaintiff McMahon says in his deposition, that he first met McClernan in the James River and Kanawha Company's office, in Richmond, about March or April, 1870, and was then introduced to him by his (deponent's) friend, G. H. Reath, who requested him to give all the aid he could to McClernan in selecting a suitable location for merchandising on the line of the Chesapeake & Ohio railroad company; that Reath spoke to him very highly of McClernan, and he (deponent) advised as to the best thing he could do, that he visit the road, and he (deponent) promised to give him the best information in his power; that he next met him at the Mud tunnel, in Allegheny county, and he (deponent) then and there laid before him his views regarding the improvement of the navigation of Greenbrier river; that he (deponent) went to Lexington, Virginia, to captain Jayhugh Wills, requesting him to take his brother, J. R. Wills, out to Greenbrier river with him, with a view of examining the river in person, and to report to him the practicability of his (deponent's) idea; that both went out and built a skiff at Greenbrier bridge, and made a trip down the river, and on his (deponent's) return from Kanawha sometime after, he met them at Graham's Ferry, and they all came to the White Sulphur Springs together, at which place they met McClernan; that he, witness, took it for granted, in view of Reath's request in Richmond, on the occasion of the introduction to McClernan, that in coming out to a strange country to do a merchandising business, that he had funds sufficient for such a purpose, and he accordingly proposed to him to take one-third interest in the boating business which Wills and witness, from their examination and observation of the river, had concluded to go

into; and after he, Wills and deponent, had talked the whole matter over, and all agreeing to form a partnership, he (McClernan) sat down and wrote the contract now on file in this suit; that some one or two months after this, he (McClernan) informed him that he had been disappointed in raising the funds he expected to put into the partnership, but that he hoped soon to be in a condition to do so; hoping that all would come right, he (deponent) continued to supply funds to carry on the business of the concern; "and previous to my borrowing the $10,000 from the Chesapeake and Ohio railroad company, I had spent over $4,000; Mr. McClernan is mistaken when he says the Chesapeake and Ohio railroad company made the loan in installments; I received it all at once. Mr. McClernan was very indiscreet in his general conduct, and I found that he was not a reliable man in business, and he failing to comply with his contract, I have been advised by my friends to dissolve the partnership; many men in the country doubted of the success of the navigation of Greenbrier river, and the Chesapeake and Ohio railroad company had fears also thereof, which is evidenced by the fact of my having to deposit with it collaterals to the amount of $20,000, to secure the loan of $10,000. Now, suppose that after spending $5,000 or $6,000 in sluicing the river, building boats, houses, and making other necessary preparations for the business, that it proved a failure; what did Mr. McClernan have in the concern to indemnify me, as I had already paid out all the whole expense that had been incurred up to that time? Besides, I frequently was subjected to great risks. There were from two to four boats going down the river, and frequently their cargo consisted of merchandise, amounting in value from $2,000 to $5,000 each. Now, should it occur that these boats and their freights were lost or damaged, there was no responsible person connected with the company navigating the river but me, hence, I would be compelled to bear the whole

loss. Neither the Chesapeake and Ohio railroad com- <sub>1877. January Term.</sub> pany, nor the contractors thereunder, would ship by the <u>McMahon *et al.*</u> boats, or enter into contracts with irresponsible parties. McCleruan. Up to the date of my former depositions at Lewisburg, West Virginia, April 22, 1871, I had expended $15,000 on account of the boating business, and had not received anything in return. What had Mr. McClernan done up to the date of dissolution? In the first place, he deceived me in the contract when he stated that he would furnish one-third; secondly, the money I placed in his hands to pay off the current expenses of the company as they fell due, he misapplied, having appropriated some $1,200 to $1,400 to his own private use without my permission, as appears by the cash account on our books, nor did he even consult Captain Wills in relation thereto. But for believing and expecting that Mr. McClernan would furnish his proportion of the necessary capital to carry on the business according to his contract and undertaking, I could have procured the services of a competent agent to carry on the business as well as McClernan, and at an expense not exceeding $80 per month, and thereby have avoided all the annoyance he (deponent) has been subjected to. When I obtained the loan, McMahon & Co. were not named once. It was decidedly a loan to me individually, as the receipt of the vice-president of the Chesapeake and Ohio railroad company to me for the $20,000, collaterals deposited with the company to secure them, will show. There was no understanding that I was to negotiate a loan for the benefit of the firm. Both McClernan and Wills were strangers to the railroad company, and to the contractors in their employ, and also in the community in which we were then about to operate, and all these knew and had confidence in my judgment, having been theretofore successful, then being willing to expend any money on the project in view of the improvement of the river, believing it would ultimately pay a reasonable compensation for the investment, they all

promised to sustain us as far as in their power, and Mc-Clernan and Wills cheerfully entered into the contract of co-partnership herewith filed, and seemed to be very thankful to me for the opportunity of going into a business that they had reason to believe would redound to their interest and the benefit of their families. In a general conversation with them, I informed them that my engagements elsewhere were such that I could not give the business my personal attention, but the verbal contract I had then made with the company in my own name, and previous to the existance of the partnership, amounts to seven-tenths of the whole amount of the boating business, and this contract I turned over to Mc-Mahon & Co., so long as they would perform their duty; and this was considered by them as more than equivalent to any service I could render by my presence. Notwithstanding my occasional absence, I was looked upon as principal by all parties, and in passing and repassing, staid at the office of the concern and gave it my supervision and direction, purchased all the supplies that were purchased east, and paid for same, and sent my checks monthly to meet the current expenses, &c.

5th Question—If you have examined the inventory filed with the papers in suit and marked G, please give your opinion as to its correctness and the correctness of the values fixed upon the different articles there named?

Answer—I have examined the inventory of stock, &c., marked G, and know the property embraced therein, and would not be willing to take the same at an abatement of fifteen per cent. on the price annexed thereto; many articles put down at cost prices were totally worthless, and property embraced therein to the amount of $128.25, belonging to the Hazard Powder Co., and not McMahon & Co., and should not consequently be included in the inventory. The property embraced in the inventory was sold in September, 1872, and did not bring one-half what it was appraised at, al-

though the time and everything else was favorable to a sale."

William C. Wickham, vice-president of the said railroad company, in his deposition, says:

"I am now vice-president of said railroad company, and have been since 1869. In May, 1870, finding it difficult to have supplies for the contractors working on the line of the road which was under process of construction west of the White Sulphur Springs, forwarded by wagons, it was deemed advisable to improve the navigation of the Greenbrier river for batteaux, and get some one to contract to haul supplies and material to contractors on and for the company, at fixed rates, from White Sulphur Springs, the then terminus of the railroad, to the Greenbrier bridge, transferring them there to batteaux, and thence boating them down the river to the Great Bend tunnel, and to such intermediate points as might be necessary. Major Edward McMahon, the plaintiff in this suit made a proposition to me that if the company would loan him the sum of $10,000, and give him the carrying business of the company for its cement, etc., at certain rates, the said $10,000 to be repaid out of the sums accruing to McMahon for transportation thus done for the company, he would do the necessary work in removing obstructions to the navigation, make sluices, etc., and put on a sufficient number of batteaux to do all the necessary transportation, and charge all contractors a certain rate which was agreed upon for such transportation. I accepted the proposition, lent him the $10,000 for the company, he giving me collaterals for the faithful application of the money. The whole transaction was with him, I knowing no other person in the transaction. I had no knowledge, at the time of making this loan, that he had any partner in the transaction, and I was induced to make the contract and to make the loan with and to him from the fact of my knowledge of, and confidence in, his capacity for carrying out faithfully his contract. The contract was exe-

cuted on the 12th day of July, 1870, and was signed by Edward McMahon alone, as was also the receipt for the o10,000 loan; I never knew of any connection of Mr. McClernan with this business until some months afterwards, when I saw him at the Greenbrier bridge, apparently in charge of the warehouse and boats and batteaux, and supposed he was an agent of McMahon."

The contract of McMahon with the Chesapeake and Ohio railroad company was made subseqent to the formation of the said partnership about two months, and it seems clear to me under the law governing in such cases, that the contract must be considered as having been made for the benefit of said firm. The terms of the contract itself, in connection with the real facts, I think indicate this unmistakably. McMahon was not individually engaged in the improvement of the Greenbrier river for the purpose of shipping freight down the same from Greenbrier river bridge for the contractors and for said railroad. He and McClernan and Wills had entered into partnership and formed a firm for that purpose. It was well understood, as shown by the terms of the contract and the evidence of Wickham, that the inducement to the railroad company to loan the $10,000; for a year without interest, was, that the river should be improved and the freight of the railroad company, &c., should be transported from the then terminus of the railroad to the river at or near the Greenbrier river bridge, and thence down the river by batteaux to the place of delivery along the railroad line then being constructed down the river, at certain stipulated rates. The $10,000 was received from the railroad company by McMahon knowing the consideration of the loan, and in consideration of the loan he undertook to perform the inducement, or consideration. It also seems to me equally clear, that when the contract was made, it was intended by McMahon that his said firm should perform that part of it, which, he had undertaken to perform, and repay the $10,000 in freights for the company

within the year. Up to the 20th of February all of the $10,000 had been repaid to the company except about $1,500, and it is quite clear that the residue would have been repaid the railroad company in freights before the year was out. If it was not so repaid, it is quite possible that it was because the plaintiffs, by their conduct in this suit prevented it, in interferring with the business of the firm. Again this $10,000 was applied to the use of the firm. No considerable amount of work was done or money expended, if any, by the said firm, until the $10,-000 was procured from the railroad company. And it is evident from the said letters of McMahon and other evidence, that a large amount of the money expected to be used by the said firm was to be procured from the railroad company, for the firm, through McMahon, as was done. It is not reasonable to suppose that Mc-Mahon, at the time he made the said contract with the railroad company, expected to engage in the improvement of the river and the carrying of freight for the railroad company in opposition to the said firm. And if he had so contemplated, he would not have been permitted so to do. Story in his work on Partnership, §174, says: "But there are many implied duties and obligations of an equally important although not perhaps always of so obvious a nature. Thus, for example, it is a violation of good faith for any partner to stipulate clandestinely with third persons for any private and selfish advantage and benefit to himself, exclusive of the partnership; for all the partnership property and partnership contracts should be managed for the equal benefit of all partners, according to their respective interests and shares therein. If, therefore, any one partner should so stipulate clandestinely for any private advantage or benefit of himself to the disadvantage, or in fraud of his partners, he will in equity be compelled to divide such gains with them. The same principle will apply to clandestine bargains for his own private advantage and benefit, made in contemplation

of establishing a partnership with other persons, and as a premium for his services therein. So if a purchase is made on the partnership account by one partner, who clandestinely stipulates any reward or allowance from the seller for his own private profit, he will be compelled to share the same with his partners. So when one partner obtains the renewal of a partnership lease secretly in his own name, he will be held a trustee for the firm in the renewed lease." *Fetherstenbaugh v. Fenwick*, 17 Ves., 298; Collyer on Partnership, §179, 180, 181, 182. "The same doctrine is applied to other analagous cases. In all purchases and sales made on account of the partnership, every partner is bound to act expressly for the benefit of the partnership." Story on Partnership, §175; Collyer on Part., 181, 182, and authorities there cited. It is true that Wickham, the vice-president of the railroad company, was not aware at the time of said contract that McMahon had partners in the improvement of said river, or the carrying of freights, &c. McMahon failed to disclose the fact to Wickham, but that fact could not change the relation of McMahon and McClernan and Wills, as partners, to the prejudice of McClernan and Wills, or either of them. It is also true that McMahon delivered to the railroad company collaterals of some description, as security for the performance of said contract, but that did not in fact, in and of itself make the contract a contract for his sole, individual benefit, and not a contract for the benefit of his said firm in the face of all the other opposing facts and circumstances appearing in this record. It seems to me, under the law, and clearly established facts in this case, that the said contract made by McMahon on the 12th day of July, 1870, must be held to have been a contract made by McMahon, one of the said firm for the use of said firm. But as we have seen, it is claimed by the appellants here that the court erred in its decree in allowing McClernan to receive any benefits in the profits of the business conducted by receiver McMahon, with which it is shown McClernan had no

interest whatever. It is also claimed that the plaintiffs, without the consent of M'Clernan, dissolved said partnership on the 20th day of February, 1871, and that Mc-Clernan, at and after said dissolution, had no interest in the property and effects of said partnership which went into the hands of the receiver, or anything made thereat in carrying on the business by said receiver, because he had drawn out of said firm all, and more capital than he had therein, or than any interest he had in the assets and property of the said firm. Judge Kent, in the third volume of his Commentaries, sixth edition, page 52, says: " It is an established principle, in the law of partnership, that if it be without any definite period, any partner may withdraw at a moment's notice, when he pleases, and dissolve the partnership. The civil law contains the same rule on the subject. The existence of engagements with third persons does not prevent the dissolution by the act of the parties, or either of ' them, though their engagements will not be affected, and the partnership will still continue as to all antecedent concerns, until they are duly adjusted and settled; a reasonable notice of the dissolution might be very advantageous to the company, but it is not requisite ; and a partner may, if he pleases, in a case free from fraud, choose a very unreasonable moment for the exercise of his right. A sense of common interest is deemed a sufficient security against the abuse of this discretion." But see note b on page 53. Story on Part., §269 ; *Peacock v. Peacock,* 16 Ves., 56 ; Collyer on Part., §109, 4th Amer. edition, and authorities there cited. Gow on Partnerships, second edition, 244, says: " Considerations of that sort led to the adoption of the rule, that in the case of a partnership subsisting without articles, and for an indefinite period, any partner may, at a moment's notice, terminate the partnership. But, according to the principles, on which the dissolution must take place, a partner can very seldom; if ever, have an intent to give notice of dissolution at a period disadvantageous to the general in-

1877.
January Term.

McMahon et al.
v.
McClernan.

terests of the concern ; as when the articles do not prescribe the terms, the law ascertains what shall be the consequence, viz : that the whole of the joint property shall be sold off, and the concern wound up. No partner, therefore, can derive a particular advantage by choosing an unreasonable moment for dissolution ; as by so doing, he must suffer in proportion to the extent of his interest in the trade." See also what Sir William Grant said in the case of *Featherstenbaugh v. Fenwick*, 17 Ves., 308, 309, and also the case of *Crawshay v. Collins*, 15 Ves., referred to by Sir William Grant in his opinion. But Collyer, in the fourth edition of his work on Partnership, §181, says : " The principles which are the foundation of the foregoing decisions were long ago inculcated by the civilians, especially in that particular case when a *dissolution* is contemplated with a view to private benefit. " The renunciation of the society," says Pothier, " is not made in good faith when a partner renounces in order to appropriate to himself alone the profits which the partners proposed to acquire in contracting that relation." And Collyer refers approvingly to the case of *Howell v. Harry*, 5 Ark., 282, as he also does in note 5 to paragraph 109, before referred to. In the case of *Howell v. Harry*, 5 Ark., 270, it was held that "a partnership to continue during the pleasure of the contracting parties, is strictly a partnership at will. But to enable one partner to dissolve such partnership at his will, the renunciation must be made in good faith, and not an unreasonable time; that renunciation is not made in good faith, when one partner renounces in order to appropriate to himself the profits which the firm is entitled to receive ; that a partnership for a limited time cannot be dissolved at the mere pleasure of one partner within the time prescribed. On the contrary, it can only be dissolved from just motives, and for a reasonable cause." In that case, Judge Lacy, who delivered the opinion of the court, said: "A partnership, in its most significant and extended sense, is a voluntary

contract of two or more persons for joining together their money, goods, labor and skill, or either or all of them, upon an agreement that the gain or loss shall be divided proportionally between them, and having for its object the advancement and protection of fair and open trade. Gow on Part., p. 1; Story on Part., p. 1; 1 Pothier Pand., Lib. 17, title 2; Introd. 1; Domat Civ. Law, B. 1, tit. 8, 1st art." Again, at page 280, the Judge says: " In the present case the partnership was to continue during the pleasure of the contracting parties. It is, therefore, strictly a partnership at will, and subject to the rules that govern such agreements. * * In cases in equity, we think the true rule to be this, that to enable one partner, to dissolve at will, the partnership, two things must occur, first the renunciation of the partnership must be in good faith, and secondly, it must not be made at an unreasonable time. This is the doctrine of the civil law, and of the code of Louisiana, and Pothier lays down the same rule, and inculcates it in the same manner; for he says that no partner has a right to prefer his own particular interest to that of the firm, or to take away its profits, or to appropriate them to his own private advantage, and it is upon this principle that, while a partner is engaged in business, courts of equity will restrain him from like pursuits. He has no right to draw from the firm the diligence, skill, or capital that rightfully belongs to it. The French civil law expresses the whole law upon the subject in the following brief terms: " Dissolution of partnership, says Domat, by the will of one of the parties, applies only to partnerships, the discretion of which is unlimited, and is effected by a renunciation notified to all the parties; provided such renunciation be *bona fide,* and not made at an improper time." Renunciation is held not to be made *bona fide,* when one partner renounces in order to appropriate to himself the profits which the partners are entitled to receive. It is said to be made at an improper time, when the things are no longer entire that were of consequence

1877.
January Term.

McMahon *et al.*
v.
McClernan.

to the partnership, and which should have deferred the dissolution. A partnership for a limited period of time cannot be dissolved at the mere pleasure of one of the partners, within the time prescribed. On the contrary, it can only be dissolved from just motives and for a reasonable cause. .

Again, Judge Lacy says, at page 282 : "The partner who breaks off the partnership with an unfair design, or for selfish objects, discharges his co-partners from all liabilities to him, but he does not thereby free himself from his obligations to them. Where he quits the partnership, that he may buy for himself what the *partnership* has the right to purchase, or that he may make a profit for his own advantage and to their prejudice, he is answerable to the community for the loss and damage ; and so if he quits at an unreasonable time, which occasioned a deprivation of profit to the community, it is but right that he should repair and make good that loss." Pothier Pand. Lib., 17, tit. n. 64 to 68. Domat B. 1, tit. 8, §5, article 1 to article 8, by Straham. Story on Partnership, 383 to 420."

It seems to me that much of the doctrine declared by Judge Lacy is sound and just, but he may, perhaps, have stated some of his conclusions too broadly. I think the proposition stated by Judge Lacy, that in order to enable one or two partners to dissolve an unlimited partnership as to duration, where there are three members constituting the firm or partnership, at their will, the renunciation of such partnership must be made in good faith, and with the view and purpose ordinarily that at once, or as soon as may be, the joint property shall be disposed of, and the concern wound up. And it may be that the renunciation must not be made at an unreasonable time, but I do not think it necessary to decide that question here. The contract of partnership in the case at bar, is unlimited as to the time of its duration, and under the authorities seems to be a partnership at will. There is no allegation in the bill that McClernan prac-

ticed any fraud upon the plaintiffs, or either of them, in the procurement of the contract of partnership, nor, is there any allegation that McClernan is a defaulter to the firm, that he has misapplied the partnership effects. They do allege that the firm has done a large and profitable business, but that there has never been a complete settlement of the partnership profits or its losses; that being dissatisfied with the management of the business of the concern, they determined to terminate and wind it up, and to dissolve the partnership, and that they proceeded to do so on the 20th of February, 1871, that McClernan was unwilling, and refused to give his consent to the said dissolution, and refused to surrender the property and business, and enter into a settlement thereof, but still continues to retain and hold possession and management, although as stated, he never paid a dollar into the concern. They charge that McClernan is wholly and entirely insolvent, and should he dispose of or convert the property belonging to the partnership, they could have no recourse upon him, but would be greatly and irremediably damaged. They pray that the partnership be dissolved by decree, if it is not already an accomplished fact; that McClernan be enjoined and restrained from further or longer carrying on the said partnership business, and that a receiver be appointed to take exclusive charge, possession, management and control of the business of said firm, and of its books, notes, accounts, papers of every kind and description, and all its other property of every kind, real and personal, houses, boats, stables, implements, &c., and that said McClernan be ordered and directed to give up and surrender all such property and effects, &c., and that one of the commissioners of the court ascertain the interest and liability of each of said partners in and as to the assets.

It is evident from the frame of the prayer of this bill that its object and purpose was not to have a receiver appointed to take charge of the property, effects, &c., of

the firm or partnership which had been dissolved, or that plaintiffs *bona fide* considered dissolved, but it was to get a receiver appointed to take charge of the property of the concern and carry on its business, for a time at least, as it had before been carried on. And plaintiffs did procure the Judge of the circuit court to appoint plaintiff, McMahon, as such receiver, "to take exclusive charge, possession, management and control, of the business of the firm of McMahon & Co. And they also procured the Judge, as the same time, to order and direct McClernan to deliver up to said McMahon the said property and effects of said firm. And in the decree of the court of the 28th of April, 1871, the court directs the said receiver to continue the business of the firm and keep and return fair accounts of all receipts and disbursements on account of the business in charge, until the property of the firm and all its franchises are sold by the receiver, under the authority given by that decree. By this proceeding, the plaintiffs procured the management of the business, property and effects to be taken from the control of one partner and placed in the hands of another—not with the view of winding up the firm, but with the view of carrying on the business of the firm with its property and effects with the view on the part of plaintiffs of making large profits for the firm by the use of its property and effects for a time, and then to exclude the defendant, McClernan, from any participation therein, or any benefit thereof. It is true McClernan paid no money into the concern as capital, but McClernan says, in his deposition, that about one or two months after the date of the contract of partnership, McMahon informed him that he had been disappointed in raising the funds he expected to put into the partnership, but he hoped to be able soon to do so. This, I infer, was prior to the obtaining of the $10,000 loan from the company. No specific amount of the capital of the concern, or that each should furnish, is stated in the contract. Wills paid no money

into the firm, but he says McMahon was to furnish cap-
ital for him, but he never gave McMahon any note or
memorandum to pay him until some time after the com-
mencement of this suit. And he seems to have stated,
in the presence of witness Creigh, while the business
was going on, that the capital of the firm was furnished
by said railroad company. McClernan, in his answer,
denies that he ever refused to make a settlement with
plaintiffs, and there is no evidence in the cause that he
ever refused such settlement, or that plaintiffs ever
asked him for any settlement prior to the said pretended
dissolution of said partnership. It appears that Mc-
Clernan was cashier of the firm, and that when they
ousted him he had in his hands, as cashier, something
over a thousand dollars of the firm's money. But it is
not even shown that he was ever called upon by the re-
ceiver to pay over this money, or to account for it, or
that he had previously appropriated it to his own use,
or refused to account for it. This money came into
McClernan's hands properly, by reason of his position.
It does not appear that he was in any worse condition
financially on the 20th of February, 1871, than he was
at the date of the partnership, or that he deceived the
plaintiffs, or either of them, as to his financial ability,
before or at the date of the contract. And so far
as is alleged in the bill it does not appear that
plaintiffs, or either of them, had any more reason
to distrust the financial ability of McClernan on the
said 20th of Feburary, 1871, than at the date of said
contract. Nor does it appear that plaintiffs or either of
them at any time after the date of said contract request-
ed or required McClernan to pay any money into said
firm as and for a part of the capital thereof. And I
think it is fairly inferable, from the whole case, that the
plaintiffs did not expect, after the date of said contract
to pay any money into said ffrm as a part of its capital,
especially after the $10,000 loan was procured from the
railroad company. While McClernan did not pay

1877.
January Term.

McMahon *et al.*
v.
McClernan.

actual money into said firm as capital he contributed nearly one year of his life in its service as the chief manager of the business of said firm, and so successful was the business of said firm directed under his control, that in about three months time the business was so remunerative that it nearly paid all the expenses of the firm. It is evident from the evidence that shortly after the end of the three months, the profits of said business would largely increase in the future, for the coming year at least. All or nearly all the necessary out lay of the firm to do business for the coming year had been incurred. The receipts of the firm in its business would in the future be to a very large extent profit. With this flattering prospect of largely increased profits in the future to said firm, the plaintiffs on the 20th day of Feburary, sought in the mode shown by the case to eject McClernan from the firm or any control of its business and carry on the business of the firm through one of them as receiver with the property and effects of the firm for their sole use and benefit, and to the exclusion of McClernan. And the receiver did carry on the business with the property and effects of the firm under the direction of the court and realized a profit after paying every expense and debt of the firm of over the large sum of $13,000. And now the plaintiffs claim that said partnership was dissolved on the 20th day of Feburary, 1871, and under the circumstances they claim that McClernan should not only be excluded from participating in said profit but that plaintiffs should have a decree against McClernan for over $10,000. It seems to me from the whole case that the alleged dissolution of the 20th of January, 1871, was not *bona fide* and that the renunciation of the partnership alleged to have been made at that time was made by the plaintiffs to appropriate to themselves profits which the firm was entitled to receive, and which were in fact afterwards realized by the use of the property and effects of the firm and that the defendant, McClernan is entitled to

participate in said profits to the extent and in the mode provided and directed by said decree. I think it is true as decided in the case of *Durbin v. Barber and Barney,* 14th Ohio, 311, that a court of equity, in decreeing a recission of articles of co-partnership for a violation of its terms, may fix the date of the dissolution at the time of the abandonment by the aggrieved party, if the equities of the party so require. But I do not think the equities of the plaintiffs in this case require that the defendant shall be excluded from the profits realized from the business of the firm after the 20th of February, 1871. The case in 14th Ohio was materially different from the case at bar. The case of *Whitesides v. Lafferty,* 3d Humphrey (Tennessee) page 150, is wholly unlike the case at bar— the principles involved in the two cases are materially different, and the circumstances of the cases are quite dissimilar. The case of *Taylor v. Hutcheson,* 25 Gratt., 586, cited by appellant's counsel, I think announces the law correctly as applicable to that particular case and the circumstances and facts disclosed by the pleading and evidence therein. In that case it decided that the partnership was dissolved by operation of law, and there the partner who remained in Washington upon the dissolution of the partnership by law, treated the partnership as being so dissolved, and at once proceeded to wind up the business of the firm in good faith, and did so wind it up. The circumstances and equities of that case are materially different from those of the case at bar, which in my view may be readily perceived. In the case of *Beverly v. Brooke et al.* and *Same v. Scott et al.,* Judge Baldwin, in 4 Gratt., at page 212, says: "During such controversy, the rents are accruing in the custody of the court, ready to be paid over to the party ultimately prevailing. In truth, from the time of the order of appointment, both parties are in possession by the hand of the receiver and when the question of right is ultimately decided, the possession of the party prevailing becomes exclusive throughout the whole period, by relation to the

date of the order. This is clear, both upon principle and authority. In such case, there can be no rule of diligence for the exclusive appropriation of the rents." This is undoubtedly good law in the cases to which it applies, and I have no fault to find with it. But when a dissolution of a partnership has taken place, an account will not only be decreed, but if necessary, a manager or receiver will be appointed to close the partnership business, and make sale of the partnership property; so that a final distribution may be made of the partnership effects, &c. 1 Story's Eq. Juris. §672. The appointment of a receiver, when directed, is made for the benefit, and on behalf of all the parties in interest, and not for the benefit of the plaintiff or of one defendant only, 2 Story's Eq. Juris., §829. It has been decided that the court will not upon motion, appoint a receiver of the partnership unless it appear that the plaintiff will be entitled to a dissolution at the hearing. Collyer on Part., §353; Gow. on Part., 2 Amer. Ed., at page 128, says: "The principle indeed upon which the court of chancery interferes between partners by appointing a receiver, is merely with a view to the relief, by winding up and disposing of the concern and dividing the produce, but not for the purpose of carrying on the partnership. Therefore a receiver of a partnership will not be appointed upon motion, unless it appear that the plaintiff will be entitled to a dissolution at the hearing; for otherwise the court might make itself the manager of any trade in the kingdom." While I think the court erred in holding that said partnership was in fact dissolved on the 20th of February, 1871, still I don't think the plaintiffs were prejudiced thereby. Under the views I have taken in this case, it does not seem to me that the circuit court committed any error in its said decrees of the 28th day of April, 1871, and of June 30th, 1875, prejudicial to the plaintiffs, and the appellee seems satisfied with decree. For the foregoing reasons the said decree of the circuit court of the county of Greenbrier, rendered in

this cause on the 30th day of June, 1875, must be affirmed with damages according to law, and that the appellee recover against the appellants his costs in this court in this cause expended.

DECREE AFFIRMED.